# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 16-00264-01-CR-W-DGK |
| Tyreese Thompson, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE (Doc. #42) filed on March 16, 2018, by defendant Tyreese Thompson ("Thompson"). On May 15, 2018, the undersigned held an evidentiary on Thompson's motion to suppress. Thompson was present and represented by his counsel, Federal Public Defender Robert Kuchar. The government was represented by Assistant United States Attorney David Raskin. At the evidentiary hearing, oral testimony was given by Detective Justin Crump and Officer Brandon Winders, both with the Kansas City, Missouri Police Department, and by Special Agent Charles Backer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Map |
| Gov't. #2 | Consent video |
| Gov't. #3 | Arrest warrant |
| Gov't. #4 | Consent form |
| Gov't #5 | Miranda waiver |

On the basis of all the evidence adduced at the evidentiary hearing and the legal arguments advanced, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. Justin Crump is currently a detective-in-training with the Kansas City, Missouri Police Department ("KCMPD") who, prior to 2018, had been a tactical operator on KCMPD's Street Crimes Tactical Squad. Tr. at 3.

2. KCMPD's Street Crimes Tactical Squad is responsible for executing narcotics and high-risk search and arrest warrants. Tr. at 4.

3. In 2016, Det. Crump was a "point man" for KCMPD's Street Crimes Tactical Squad. Tr. at 5.

4. A point man is generally the first officer to enter through the door of a residence when a warrant is being executed and thereafter deploys officers conducting any search. Tr. at 5.

5. Brandon Winders is also a tactical operator on KCMPD's Street Crimes Tactical Squad. Tr. at 41.

6. Charles Backer is a Senior Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Tr. at 60.

7. Agent Backer is assigned to the Illegal Firearms Squad – a task force between KCMPD and ATF to work cooperatively on violent crimes that involve firearms. Tr. at 60.

8. In 2016, the Illegal Firearms Squad was investigating a pawn shop burglary in St. Joseph, Missouri, in which several firearms were stolen. Tr. at 61, 63.

9. In the course of the investigation of the pawn shop burglary, the Illegal Firearms Squad identified a suspect by the name of Tyreese Thompson, who was also the subject of a pending felony arrest warrant for robbery. Tr. 61

10. The Illegal Firearms Squad received information from a confidential informant that Thompson could be found at a residential address in Kansas City, Missouri – 3707 East 72nd Street. Tr. at 61.

11. On March 8, 2016, Agent Backer traveled to 3707 East 72nd Street with several members of the Illegal Firearms Squad and also requested a team from KCMPD's Street Crimes Tactical Squad. Tr. at 64.

12. After arriving at the address, Agent Backer and other officers surveilled the residence and observed an unidentified black male come out the front door of the house, retrieve mail from the mailbox, and reenter the house. Tr. at 64-65.

13. Because there was an unknown man in the house, Agent Backer and the other officers at the scene decided to have the tactical squad approach the residence to see if the man in the house was Thompson. Tr. at 65.

14. On March 8, 2016, Det. Crumb was the point man for KCMPD's Street Crimes Tactical Squad for the operation to detain and arrest Thompson at 3707 East 72nd Street. Tr. at 5-6, 21-22.

15. Det. Crumb and the tactical squad arrived mid to late morning. Tr. at 6, 24.

16. Det. Crumb and the tactical squad were briefed that Thompson was wanted for a burglary, the officers at the scene believed the house belonged to Thompson's girlfriend, the officers at the scene had seen a male (who could not be identified as Thompson) come out on to the front porch before going back into the residence, and it was believed that Thompson was inside the residence. Tr. at 8-9, 22, 25-27.

17. Det. Crumb and the tactical squad were shown photographs of Thompson. Tr. at 8-9.

18. The residence at 3707 East 72nd Street was a small bungalow-styled house with a medium-sized front porch. Tr. at 6-7.

19. At approximately 12:25 p.m., Det. Crumb and the tactical squad proceeded to perform a residence check at 3707 East 72nd Street. Tr. at 9, 22.

20. As per the usual procedures, 6-8 tactical officers (including Det. Crumb) approached the front door at 3707 East 72nd Street. Tr. at 10, 27.

21. As he was approaching the house, Det. Crumb saw the blinds on one of the front windows to the house move in a manner that suggested someone was looking through the blinds. Tr. at 10-11, 28.

22. Det. Crumb proceeded to the front door and knocked while loudly announcing "Police." Tr. at 11.

23. After knocking, Det. Crumb could hear movement in the house. Tr. at 28-29.

24. While waiting for a response, another tactical officer on the porch told Det. Crumb that he had just seen the shades move on one of the front windows. Tr. at 11-12.

25. After six to eight minutes (and 15-20 knocks on the front door), a man (later identified as George Richards) answered the door. Tr. at 11-13, 30.

26. Due to the amount of time that it took someone to answer the door and based on his experience in executing warrants, Det. Crumb suspected that efforts had been made inside the house to hide either evidence or individuals. Tr. at 13.

27. Mr. Richards opened the door and had a dog beside him. Tr. at 14, 30.

3

28. Because the dog was acting "aggressively" toward Det. Crumb, Mr. Richards was asked to detain the dog. Tr. at 14, 30.

29. Mr. Richards dragged the dog by its collar to a kennel in a nearby room, leaving the front door open. Tr. at 14.

30. While waiting for Mr. Richards to secure the dog, Det. Crumb saw an individual he believed to be Thompson lean out from a behind a corner. Tr. at 14, 31-32.

31. Det. Crumb ordered Thompson to show his hands. Tr. at 14, 32.

32. Thomson initially ignored the command and retreated behind the wall he had been looking around, but – after Det. Crumb called him by name and told him "It's over" – Thompson reappeared from behind the wall. Tr. at 14-15, 32-33.

33. Det. Crumb asked Thompson to come out of the house, which he did. Tr. at 15.

34. Det. Crumb noted that Thompson had dust/spider webs on his right arm, the right side of his white t-shirt, the right side of his neck, and the back of his head and hair. Tr. at 16-17, 66.

35. After Thompson was off the porch and being detained by other officers, Det. Crumb asked Mr. Richards (who had returned from securing the dog) whether there was anyone else in the house to which Mr. Richards responded "Nobody else that I know of." Tr. at 18.

36. Based on his experience in executing warrants, Det. Crumb believed Mr. Richard's equivocal response was suspicious. Tr. at 18-19.

37. Based on officer safety concerns, Det. Crumb decided to conduct a protective sweep of the house to see if anyone else was in the residence, limiting the sweep to only those areas that were large enough to permit a person to hide. Tr. at 18-20, 43.

38. Neither Mr. Richards nor Thompson objected when Det. Crumb announced that the tactical squad was going to perform a protective sweep of the house. Tr. at 37.

39. One of the officers performing the sweep was Officer Winders. Tr. at 41.

40. As part of the sweep, Officer Winders checked a closet in one of the bedrooms in the residence. Tr. at 45.

41. In determining that there were no individuals hiding in the closet, Officer Winders was alerted to the fact that there was an attic access in the closet ceiling. Tr. at 45-46.

42. Officer Winders noted that cobwebs around the attic door appeared to have been disturbed (*i.e.*, no longer connected to one surface and hanging loosely) and the walls of the closet showed a scuff mark that appeared to have been made with a shoe. Tr. at 46-48.

43. Officer Winders opened the attic door slightly and took a fast peek into the attic with his flashlight.  Tr. at 46, 48-49.

44. Officer Winders initially saw what appeared to be a firearm.  Tr. at 46, 49-50.

45. Officer Winders then went up into the attic to make sure that no individuals were hiding in the space.  Tr. at 47, 50.

46. In "clearing" the attic for the presence of any people, Officer Winders saw four firearms in the attic.  Tr. at 50.

47. Officer Winders left the attic and informed officers, including Agent Backer, about the firearms.  Tr. at 50, 66.

48. Agent Backer was standing with Mr. Richards in the front yard of the residence while the protective sweep occurred.  Tr. at 67, 72.

49. Mr. Richards told Agent Backer that he owned the residence.  Tr. at 67, 73, 76.

50. Mr. Richards also told Agent Backer that Thompson was a guest who had stayed overnight the previous evening.  Tr. at 77.

51. After being told about the firearms in the attic, Mr. Richards denied any knowledge regarding the weapons.  Tr. at 67-68.

52. Agent Backer (after verifying that Mr. Richards was the owner of the property) asked Mr. Richards if he would consent to a search of the house.  Tr. at 68.

53. Mr. Richards consented both orally and in writing and the entire house was thereafter searched.  Tr. at 20, 68.

54. Four firearms in the attic were seized as part of the search.  Tr. at 69-70.

55. Subsequently, on March 15, 2016, Agent Backer conducted an interview of Thompson (then in the custody of the St. Joseph Missouri Police Department).  Tr. at 70-71.

56. Prior to the interview, Thompson was advised of his *Miranda* rights.  Tr. at 71.

57. Thompson waived his *Miranda* rights both orally and in writing and spoke to Agent Backer.  Tr. at 70-71.

58. In the course of the interview, Thompson made incriminating and/or inculpatory statements.  Tr. at 71.

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Thompson argues that the warrantless search of the residence at 3707 East 72nd Street violated the Fourth Amendment and, as a consequence, the Court should suppress all contraband seized from the residence as well as later-discovered evidence (including statements subsequently made to law enforcement officers).

Before determining whether the Fourth Amendment was violated in this case, however, the Court must first determine whether Thompson has established a basis for him to even raise a constitutional challenge to any search at 3707 East 72nd Street. Federal courts typically refer to this analysis as a question of "standing" – a terminology that the Supreme Court has questioned. *See*, *e.g.*, *Rakas v. Illinois,* 439 U.S. 128, 139-40, 99 S.Ct. 421, 428 (1978). Regardless of the terminology employed, however, the law is well-settled that "Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015). Consequently:

> [A] defendant moving to suppress bears the burden of proving <u>he had</u> a legitimate expectation of privacy that was violated by the challenged search.

*United States v. Mosley*, 878 F.3d 246, 255 (8th Cir. 2017) (*citations and internal punctuation omitted*) (*emphasis added*). Thus, whether viewed as a question of "standing" or a matter of substantive Fourth Amendment law, "[i]n order to show a legitimate expectation of privacy in the searched premises, the person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999)

In general, in determining the question of Fourth Amendment "standing," courts usually confront and consider issues of "ownership" and/or "permission." *Mosely*, 878 F.3d at 255. In this case, there is no dispute that Thompson was <u>not</u> the owner of the residence at 3707 East 72nd Street. Nonetheless, Thompson asserts that he has "standing" to assert Fourth Amendment rights as an "overnight guest" of George Richards. As will be discussed, *infra*, such a status does permit the assertion of Fourth Amendment rights in some instances. But prior to addressing the rights of an overnight guest, the Court must consider whether Thompson, in fact, has established that he was an overnight guest.

The sole evidence supporting Thompson's claim is the cross-examination testimony of Agent Backer to the effect that Mr. Richards told him at the scene of the search that "Thompson had been dropped off at his house by an unknown back female" and that "Thompson had asked to spend the night and ended up sleeping there overnight in the back southwest bedroom." Tr. at 77. Neither Mr. Richards nor Thompson themselves testified at the suppression hearing. As noted by the Eighth Circuit in *Mosely* and quoted above, the defendant "bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." *Id.* The government strenuously argues that the hearsay statement from Richards is too unreliable to meet Thompson's burden, taking the position:

> [I]n order to establish standing, [Thompson has] to do it through the testimony of Mr. Thompson or Mr. Richards and [he] can't do it based on the hearsay statements that Mr. Richards made on the day in question.

Tr. at 75. *Compare United States v. Armenta,* 69 F.3d 304, 308 (9th Cir.1995) ("[The defendant's] bald assertion that he was an overnight guest . . . is not sufficient to establish that he had a legitimate expectation or privacy in the house.").

7

If this matter goes to trial, the government's evidentiary argument may carry weight. In a suppression hearing, however, hearsay evidence is routinely utilized – indeed, typically by the government (as was done in this case). *See*, *e.g.*, *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) ("Although not admissible at trial, the district court may rely on hearsay evidence at a suppression hearing."). To the extent, that the government is arguing that the Fourth Amendment standing issue is somehow unique and cannot be shown by hearsay in a suppression hearing, the Court would merely note that the Eighth Circuit has concluded differently:

> [The defendant] asserts that he did indeed establish [Fourth Amendment standing]. He cites the testimony of a police officer during a hearing on [the defendant's] motion to suppress. That testimony concerned an interview by the police officer with a juvenile who was riding in the same car as [the defendant] when the police stopped the car. The juvenile stated to the officer, according to the testimony, that [the defendant] had been staying in the apartment in question "for a couple of days" as a guest. We agree with [the defendant] that that testimony is sufficient to establish that he had a legitimate expectation of privacy in the apartment.

*United States v. Dickson*, 64 F.3d 409, 410 (8th Cir. 1995).

Accepting, then, that the evidence[1] establishes Thompson's status as an "overnight guest" of Mr. Richards, the constitutional question becomes the scope of the rights of such an individual. The Supreme Court addressed the issue in its seminal opinion in *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684 (1990).

---

[1] Although not argued by the government, it could be asserted that the evidence presented at the suppression hearing only showed that Thompson spent the night at the Richards' residence and did not definitely establish that such a stay was by invitation or permission.

> An overnight guest is much more than someone who simply spends the night. Such status is contingent upon an invitation by an authorized host.

*United States v. Gonzales–Barrera,* 288 F.Supp.2d 1041, 1050 (D. Ariz. 2003). Here, while there is ambiguity, the Court finds there is a reasonable inference from the evidence that Mr. Richards invited Thompson to spend the night or granted him permission when Thompson asked.

8

In *Olson*, the Supreme Court established that an "overnight guest" has a legitimate expectation of privacy in the residence of his or her host. The case arose after the defendant became a suspect in the robbery of a gas station and the murder of the station manager. *Id.* at 93, 110 S.Ct. at 1686-87. Police learned that the defendant had been staying in a duplex with a friend, and surrounded the house when a neighbor told them that the defendant was there. *Id.* When the defendant would not exit the house upon an officer's request, the police forcibly entered the house and arrested him. *Id.* at 94, 110 S.Ct. at 1687. The defendant challenged the constitutionality of the warrantless entry into the house. The Supreme Court found that, as an overnight guest in his friend's home, the defendant had an expectation of privacy in the home, which society recognizes as reasonable. *Id.* at 96, 110 S.Ct. at 1688. The Court explained:

> We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. . . . The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises.

*Id.* at 98–99, 110 S.Ct. at 1689. The court ultimately concluded that because the defendant's expectation of privacy was "rooted in understandings that are recognized and permitted by society," the expectation was reasonable. *Id.* at 99, 110 S.Ct. at 1690. Thus, the Court allowed the defendant to claim the protection of the Fourth Amendment. *Id.* at 100, 110 S.Ct. at 1690.

Applying *Olson*, it seems clear that Thompson had some legitimate expectation of privacy in the Richards' residence on March 8, 2016. Nonetheless, an issue of Fourth Amendment standing still exists. As noted in *United States v. Osorio*, 949 F.2d 38 (2d Cir. 1991), while *Olson* recognized Fourth Amendment rights for an overnight guest, "that expectation [of privacy] will not always extend to the entire premises." *Id*. at 41. *See also United States v. Peña Ontiveros*, 547 F.Supp. 2d 323, 329-30 (S.D.N.Y. 2008) (overnight guests' expectation of privacy did not extend to items found inside hidden trap in house), *aff'd sub nom.*, *United States v. Beltran*, 409 Fed. Appx. 441 (2d Cir. 2011); *United States v. Cruz*, 475 F.Supp. 2d 250, 258 (W.D.N.Y. 2007) (occasional overnight guest did not have standing to challenge search of refrigerator located in basement of premises). As summarized by one court:

> [T]he mere legitimate presence on the searched premises by invitation or otherwise, is insufficient in itself to create a protectible expectation. A defendant must also establish a legitimate expectation of privacy <u>in the particular area searched</u> in order for a fourth amendment challenge to be allowed.

*Campbell v. United States*, 2015 WL 3765317, op. at *15 (M.D. Fla. June 16, 2015) (*quoting United States v. Meyer,* 656 F.2d 979, 981 (5th Cir.1981)) (*emphasis added*).

Consequently, the Court must consider whether Thompson has established that he had a legitimate expectation of privacy – not in the Richards' house generally – but in Richards' attic. The only "evidence" that seems to go to this issue is the cross-examination testimony of Agent Backer acknowledging that the entry to the attic was in the closet ceiling in the particular bedroom where Thompson was staying. The Court finds that this "evidence" is insufficient to establish Fourth Amendment "standing" for Thompson to challenge a search of the attic.

10

Case 4:16-cr-00264-RK   Document 49   Filed 06/11/18   Page 10 of 18

In the alternative,[2] the Court will briefly address Thompson's constitutional claims under the assumption that his status as an overnight guest afforded him standing to challenge a search of Mr. Richards' attic.

The government argues that the seizure of the firearms was justified by a sequential series of permissible events – the officers' presence at the residence to arrest Thompson based on a valid outstanding arrest warrant, the ensuing post-arrest protective sweep of the house for purposes of officer safety, the resulting "plain view" observation of the firearms in the attic, and the subsequent consent to a warrantless search of the house by Mr. Richards. The Court agrees that each step in the process was constitutionally justified.

There has been no argument that the arrest warrant for Thompson was invalid. As such, that warrant carried with it the implicit, but limited, authority for officers to enter the residence of the person named in the warrant in order to execute that warrant. *Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 1388-89 (1980). In this case, of course, officers did not go to Thompson's residence, but rather to location where they had reason to believe they might find Thompson. Whether a full-scale entry into the Richards' house to locate and arrest Thompson would have been warranted is irrelevant – Thompson was at the house and surrendered himself to the authorities <u>outside</u> of the house. The information obtained by the officers from a confidential informant – at a minimum – permitted the officers to conduct a "knock and talk" at the Richards' residence.

---

[2] Although not argued by Thompson, there is evidence in the record that he told Agent Backer in his *Mirandized* interview that one of the guns (the 9 mm. Glock) belonged to him. It might be suggested that if an overnight guest acknowledges ownership of property found in a particular location of a house, there is an inference that the guest had permitted access to the area and a reasonable expectation of privacy in the area. In the event that such reasoning would prevail, the Court makes its alternative findings herein.

11

> [I]t does not violate the Fourth Amendment merely to knock on a
> door without probable cause. . . . No Fourth Amendment search
> occurs when police officers who enter private property restrict
> their movements to those areas generally made accessible to
> visitors – such as driveways, walkways, or similar passageways.

*United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008).

Moreover, having been at the Richards' residence legitimately to locate (and ultimately arrest) Thompson, the officers – under the totality of the circumstances – were further justified in performing a protective sweep of the residence, even post-arrest. Certainly, the Court is mindful that law enforcement entry into the residence of a citizen raises profound Fourth Amendment concerns. The Fourth Amendment specifically provides that "the right of the people to be secure in their persons, <u>houses</u>, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV (*emphasis added*). As made clear in the express language of the Fourth Amendment, however, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). As protection for citizens from unwarranted government intrusion, the Fourth Amendment generally requires officers to obtain a court-sanctioned search warrant based on probable cause before searching private property. *See*, *e.g.*, *Shade v. City of Farmington, Minnesota*, 309 F.3d 1054, 1059 (8th Cir. 2000).

Nonetheless, in many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. In this case, the officers did not have a warrant to search the Richards' residence. In that regard, the Supreme Court has cautioned:

> [S]earches conducted outside the judicial process, without prior
> approval by judge or magistrate, are *per se* unreasonable under the
> Fourth Amendment – subject only to a few specifically established
> and well-delineated exceptions.

*Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 1716 (2009) (*quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514 (1967)). Nonetheless, one of those well-delineated exceptions applied in this case. A recent illustrative case is *United States v. Alatorre*, 863 F.3d 810 (8th Cir. 2017).

In *Alatorre*, members of a state-federal task force executed an arrest warrant for the defendant at his residence. In executing the warrant, the officers knocked on the door of the defendant's residence.

> In response, the officers testified that they heard and saw movements in the residence consistent with multiple people inside, but the officers could not tell how many people were moving around behind the closed door and blinds. The officers also heard voices suggesting more than one person was present to participate in a conversation or hear instructions. Someone suspiciously came to the door and then retreated.
>
> Next, the officers knocked again and announced, "Police with a warrant. Come to your door." [The defendant] did not immediately respond, so the officers knocked-and-announced at least two more times after the delay. [The defendant] finally opened the front door, and officers quickly placed him in handcuffs and removed him to the porch. When asked if anyone else was inside, [the defendant] said, "My girlfriend." The officers could not see anyone from the front door. An officer shouted, "Anyone else inside, come to the door." The girlfriend came out of the kitchen and to the front door. She was immediately pulled outside onto the porch with the officers. She said there was no one else inside. The officers had experience with some arrestees lying to them in the past about the presence of others inside a residence.

*Id*. at 812. Because the officers were "concerned for their safety due to uncertainty as to the number of people inside because of the noises from inside the house heard prior to the door opening, the movements minimally visible through the blinds before the door opened, the quiet voices heard inside, and the hesitancy of the occupants to open the door," a decision was made to a protective sweep of the home. *Id*. Both firearms and illegal drugs were seen in plain view during the ensuing sweep. *Id*.

On appeal, the defendant argued that the protective sweep was constitutionally impermissible. The Eighth Circuit disagreed. The court noted that protective sweeps were a recognized exception to the warrant requirement embodied in the Fourth Amendment – particularly when it is appropriately confined to "a quick and limited search of premises" and limited "to a cursory visual inspection of those places in which a person might be hiding." *Id*. at 813 (*quoting*, *in part*, *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094-95 (1990). As explained by the Eighth Circuit:

> The Fourth Amendment permits "the protective sweep . . . if the searching officer possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing that the area swept harbored an individual posing a danger to the officer or others."

*Id*. (*quoting, in part, Buie*, 494 U.S. at 327, 110 S.Ct. at 1095).

The Eighth Circuit in *Alatorre* rejected the defendant's argument that a post-arrest protective sweep was impermissible. *Id*. (*citing United States v. Cavely*, 318 F.3d 987, 995-96 (10th Cir. 2003) (officers executing an arrest warrant just outside the back door of the defendant's house were justified in making a protective sweep of his house); *United States v. Hoyos*, 892 F.2d 1387, 1396-97 (9th Cir. 1989) (narcotics officers were justified in making a protective sweep of defendant's residence after arresting him outside); *United States v. Boyd*, 180 F.3d 967, 975 (8th Cir. 1999) (protective sweep valid even though the defendant "had already been handcuffed and taken to [another area]"); *United States v. Davis*, 471 F.3d 938, 944-45 (8th Cir. 2006) (upholding protective sweep of defendant's barn after arrest outside of the barn)).

After noting that the analysis of the propriety of a protective sweep was necessarily fact-specific, the *Alatorre* court found that the sweep undertaken by the officers in that case was justified by several articulable facts and rational inferences supporting the officers' reasonable beliefs that someone else could be inside the house posing a danger to them during and/or following the arrest. Those facts included:

> (1) The defendant's girlfriend lingered in the kitchen out of sight of the officers until she was specifically called to the door, indicating that it was easy for someone to hide just out of view of the officers inside the residence in a position from which an attack could be launched;
>
> (2) Guns or other dangerous weapons were conceivably present in the residence given the defendant's criminal history involving concealed weapons and the alleged violent baton attack prompting the arrest, giving anyone remaining inside the residence access to weapons to use in an ambush of the officers;
>
> (3) The audible movements and behaviors (e.g., coming to the door and retreating; quietly conversing) of people behind the door and blinds after the officers knocked, along with the delays in answering the door, created a reasonable uncertainty as to how many people were inside the residence and their intentions toward the officers; and
>
> (4) Officers on the front porch of the residence dealing with the defendant and his girlfriend were vulnerable to attack from someone inside the residence.

*Id*. at 814-15.

Turning to the facts of Thompson's case, this Court similarly concludes that the protective sweep was justified by several articulable facts and rational inferences supporting the officers' reasonable beliefs that someone else could be inside of the Richards' residence posing a danger to them during and/or following Thompson's arrest. Specifically:

> (1) Thompson was wanted for committing a dangerous crime of violence,

15

(2) Officers detected movement in the house by sound and the moving of window blinds even though no one immediately answered the door knock,

(3) No one answered the door for several minutes,

(4) Thomson emerged from the house with dust and cobwebs on him, and

(5) Mr. Richards gave an equivocal answer in responding to whether there were other people in the house.

Based on these and other factors (including the officers' experience in executing warrants), a limited protective sweep of the house was justified. Because it was both possible and not unusual to suspect that an individual may hide in the attic, the protective sweep properly included a brief inspection of the attic.

In performing that valid protective sweep, Officer Winders saw the firearms in "plain view" in the attic. The plain view doctrine allows officers to seize an object without a warrant if:

(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,

(2) the object's incriminating character is immediately apparent, and

(3) the officer has a lawful right of access to the object itself.

*United States v. Collins,* 321 F.3d 691, 694 (8th Cir. 2003).

Based on the plain view doctrine, Officer Winder would have been justified in seizing the firearms during the sweep. However, officers went the extra step of obtaining Mr. Richards' consent – oral and written – to search the house. It is established law that an exception to the warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S.Ct. 1801, 1803 (1991).

In a typical consent-to-search case, the touchstone in analyzing a motion to suppress is whether the consent was voluntary. In broad strokes, consent to search is voluntary if it is "the product of an essentially free and unconstrained choice by its maker . . . rather than a product of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48 (1973). To assist a court in making this ultimate determination, numerous factors relating to the person giving the consent and the environment surrounding the consent have been articulated. For instance, with regard to a defendant who consents, courts consider:

(1) the consenter's age;

(2) the consenter's general intelligence and education;

(3) whether the consenter was under the influence of drugs or alcohol;

(4) whether the consenter was informed of his *Miranda* rights prior to consent; and

(5) whether the consenter had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

*United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001). With regard to the environment surrounding consent, courts will examine whether the person who consented:

(1) was detained and questioned for a long or short time;

(2) was threatened, physically intimidated, or punished by the police;

(3) relied upon promises or misrepresentations made by the police;

(4) was in custody or under arrest when the consent was given;

(5) was in a public or secluded place; or

(6) either objected to the search or stood by silently while the search occurred.

17

Case 4:16-cr-00264-RK   Document 49   Filed 06/11/18   Page 17 of 18

*United States v. Mancias,* 350 F.3d 800, 805 (8th Cir. 2003). In this case, there is considerable evidence showing that Mr. Richards voluntarily consented to the search of his house and no evidence to seriously suggest that he was coerced or tricked or otherwise under duress. While Thompson did not consent to the search, the possibility of Mr. Richards consenting to such a search was part and parcel of the underlying host-guest relationship. *Compare Olson,* 495 U.S. at 99, 110 S.Ct. at 1689 ("From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone <u>but his host and those his host allows inside</u>." [*emphasis added*]). Inasmuch as the search of the premises was consensual, the officers were entitled to seize contraband – in this case, the firearms in the attic – that were found during the search.

    Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the Motion to Suppress Illegally Obtained Evidence (Doc. #42) filed on March 16, 2018, by defendant Tyreese Thompson.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                    */s/ John T. Maughmer*
                                      **John T. Maughmer**
                                  **United States Magistrate Judge**